COURT OF APPEALS OF VIRGINIA

Present: Judges Humphreys, Decker and Russell

HAYAT BENFARAJ

v.      Record No. 0597-18-4

STAFFORD DEPARTMENT OF
 SOCIAL SERVICES

MEMORANDUM OPINION[*]
PER CURIAM
NOVEMBER 27, 2018

FROM THE CIRCUIT COURT OF STAFFORD COUNTY
Victoria A. B. Willis, Judge

(Jason M. Pelt; Goodall, Pelt & Carper, on brief), for appellant.
Appellant submitting on brief.

(Catherine Miller Saller; Elizabeth Carpenter-Hughes, Guardian *ad
litem* for the minor child; Williams Stone Carpenter Buczek, PC, on
brief), for appellee. Appellee and Guardian *ad litem* submitting on
brief.

Hayat Benfaraj ("Benfaraj") appeals the orders terminating her parental rights and

approving the goal of adoption for her child, L.Y. Benfaraj argues that the circuit court erred by

(1) finding that the evidence was sufficient to terminate her parental rights and (2) not granting her

continuance request "when a subpoenaed necessary witness notified the court that she was not

available due to illness." Upon reviewing the record and briefs of the parties, we conclude that the

circuit court did not err. Accordingly, we affirm the decision of the circuit court.

BACKGROUND

"On appeal, 'we view the evidence and all reasonable inferences in the light most

favorable to the prevailing party below, in this case the Department.'" Farrell v. Warren Cty.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Dep't of Soc. Servs., 59 Va. App. 375, 386, 719 S.E.2d 329, 334 (2012) (quoting Jenkins v. Winchester Dep't of Soc. Servs., 12 Va. App. 1178, 1180, 409 S.E.2d 16, 18 (1991)).

Benfaraj and Adam Yafi ("Yafi") are the biological parents to L.Y., who is the subject of this appeal. Yafi also has a son, Y.Y., and Benfaraj is Y.Y.'s stepmother. In late January 2017, Y.Y. was four years old, and L.Y. was almost eighteen months old.

On January 24, 2017, Yafi was hospitalized for attempting suicide. He was diabetic and had taken too much medication. Yafi was released from the hospital on March 10, 2017.

On January 26, 2017, Yafi's sister, Majida Yafi ("Majida"), came from Morocco to see Yafi in the hospital. After visiting Yafi, Majida went to Benfaraj's residence and asked to see Y.Y. Benfaraj told Majida that Y.Y. was asleep, but she brought him out to Majida, who immediately noticed that Y.Y. could not see and asked Benfaraj what was wrong with Y.Y. and his eyes. Benfaraj told Majida that Y.Y. had an eye infection, which he might have caught from L.Y. Y.Y. went back to his bedroom, and Majida could hear him crying. She sat with him, and then Y.Y. started to seize. Majida called 911.

In the very early hours of January 27, 2017, an ambulance transported Y.Y. to Mary Washington Hospital for the suspected seizure. Y.Y. was unresponsive, intubated, and had suspicious bruises on him. Y.Y. was flown to Children's Hospital of Richmond at Virginia Commonwealth University (VCU) for treatment.

Dr. Robin Foster, a pediatric emergency medicine physician and director of the child protective team at VCU, examined Y.Y. Dr. Foster observed bruises on Y.Y.'s forehead, the right side of his eye, his right cheek, his left scalp, his lower jaw, his left elbow, his trunk, the inside of his right forearm, and his lower extremities. Y.Y. also had abrasions and red marks around his neck and shoulders. Y.Y.'s right eye was drooping, and an eye exam revealed that blood was pooling in the back of his eye. His right pupil was "blown and very enlarged and fixed and would not respond

to light." His left pupil was small and did not respond to light. Y.Y. had several CT scans and MRIs, which revealed blood collections around both sides of his brain. Y.Y. also had "numerous, too many to count multi layer [sic] retinal hemorrhages," and he suffered from optic nerve swelling. When Y.Y. arrived at the hospital, he was blind in both eyes, and Dr. Foster testified that his blindness would be permanent. Dr. Foster testified that Y.Y.'s blindness probably was not immediate after the acute abusive head trauma injury, rather it was "a process that is secondary to inflammation, pressure, and damage."

Dr. Foster opined that Y.Y.'s injuries "occurred on more than one occasion." Dr. Foster noted that there was a loss of brain tissue and damage to brain tissue that supported the theory of at least two different episodes of trauma. Dr. Foster explained that the loss of brain tissue was permanent and would affect his developmental milestones and cognitive function.

Dr. Foster testified that Y.Y.'s injuries could not have been self-inflicted. She opined that Y.Y.'s injuries suggested that he suffered abusive head trauma. Dr. Foster explained that "[h]is constellation of symptoms are exactly consistent with abusive head trauma in that he has acute altered mental status, bilateral subdural collections and massive bilateral retinal hemorrhages." She further stated that Y.Y. "had severe acceleration-deceleration injury on his brain that caused the pattern of internal injuries he had." She explained that the marks around Y.Y.'s neck were "consistent with somebody holding him around the neck," which could have been where he was held for the "acceleration-deceleration injury" he sustained. The external bruises on his right side, however, were "consistent with impact."

In addition to his eye and brain injuries, Y.Y.'s T1 vertebra was "crushed into multiple pieces" and was a result of directed blunt force, a non-accidental injury. Dr. Foster opined that since there was no evidence of healing, the injury was less than a week old. The shattered vertebra was evidence of "the force with which the child was impacted."

Based on his injuries, Dr. Foster stated that Y.Y. was "repetitively injured at least two or more times." One set of Y.Y.'s injuries was more than two weeks old, and one set of his injuries was less than two weeks old. Dr. Foster explained that Y.Y.'s injuries would have been noticeable to a layperson and that "there would have been a significant period of time in which he was significantly symptomatic." Dr. Foster stated that Y.Y.'s injuries would not have been so severe if he had received medical attention immediately following the first incident.

Y.Y. remained hospitalized at VCU from January 27 to February 20, 2017. In addition to his injuries, he had "significant issues with feeding." He worked with speech therapy, occupational therapy, physical therapy, child neurology, and neurosurgery. Psychologists and psychiatrists also treated Y.Y. because he suffered from post-traumatic stress disorder and anxiety.

On January 27, 2017, the police interviewed Benfaraj, who stated that she was "the caretaker."[1] She took care of the house and children while Yafi worked. Benfaraj explained that Y.Y. began living with them in June 2016. Benfaraj told the police that Y.Y. had been having a lot of behavior issues prior to his hospitalization and that he would throw tantrums and bang his head against a wall or on the floor. The police did not see any damage to the walls. Benfaraj reported that over the previous weekend, Y.Y. had heard Benfaraj and Yafi talking about an upcoming court case between Yafi and Y.Y.'s biological mother, and Y.Y. became upset and "had thrown himself on the tub." The police asked Benfaraj if she had noticed whether Y.Y.'s behavior changed after "the incident of banging his head and body around the past weekend and she said that she really didn't pay attention and couldn't say." When the police asked Benfaraj about Y.Y.'s eyesight, she said that on Monday, January 23, 2017, she noticed that Y.Y. could not open his eye. Benfaraj told

[1] The police were unable to interview Yafi on January 27, 2017, because he was intubated and unconscious in the intensive care unit of the hospital after his suicide attempt.

the police that she had not sought medical attention earlier because Y.Y. "did not have Medicaid or insurance."

In addition, Benfaraj showed the police a video that was on her cell phone. In the video, Y.Y. was "kind of slumped down" on a brown couch. Y.Y. had bruises on his head and forehead, and one of his eyes was "almost closed" with a small pupil. A male voice asked Y.Y., "what happened to him, why he would do this and asking him over and over again, . . . why would you do this to yourself." The police officer described the man's voice as "agitated and somewhat accusatory." The police determined that the time stamp on the phone showed that the video was taken January 23, 2017.

After Benfaraj's first interview with the police, she requested a second interview. At that meeting, she said that on Tuesday, January 24, 2017, Y.Y. was at the kitchen table, and Yafi was upset and repeatedly told Y.Y. to open his eye. Then, Yafi took Y.Y. to the bathroom, and Benfaraj heard "yelling and commotion coming from the bathroom." Benfaraj checked on them, and Yafi told her that he was "dealing" with his son. Benfaraj left to nurse L.Y. and continued to hear Yafi yelling at Y.Y. to open his eye. Then, Yafi left the bathroom. Benfaraj said that she had never seen Yafi so agitated before that incident. Yafi told Benfaraj that he had "struck" Y.Y. and subsequently left the house. When Y.Y. came out of the bathroom, Benfaraj saw that he had a "lump in the middle of his forehead," which was not there when Y.Y. first went into the bathroom. Benfaraj did not call 911 or take Y.Y. to the doctor.

On January 27, 2017, Kathryn Burner, a CPS worker, went to Mary Washington Hospital to visit Y.Y. and view his injuries before he was flown to VCU. Then, Burner went to Benfaraj's house, and met Benfaraj, L.Y., and Majida. Benfaraj showed Burner where Y.Y. allegedly banged his head on the floor or wall. The Stafford Department of Social Services ("DSS") subsequently entered into a safety plan with Majida so that Benfaraj was not alone with L.Y.

Burner left the home and spoke with a nurse and doctors, including Dr. Foster, at VCU. Based on the information received from those conversations, DSS immediately removed L.Y. from Benfaraj's care on January 27, 2017.[2] DSS was concerned about L.Y.'s safety in Benfaraj's care considering the severity of Y.Y.'s injuries, the lack of medical attention for Y.Y., Benfaraj's report that the injuries were self-inflicted, and the doctors' reports that the injuries were not self-inflicted.

On January 31, 2017, DSS held a family partnership meeting and discussed whether there were any viable relative placements for L.Y. Majida reported that she was returning to Morocco on February 9, 2017, and not interested in custody, so she was not a viable relative placement. Other relatives informed DSS that they "did not want to get into the middle of it" and did not want custody of L.Y. A family friend indicated that he was interested in custody; therefore, DSS instructed him on how to file for custody. However, the J&DR court later dismissed his petition for custody because he failed to appear for the hearing. Throughout the case, neither Benfaraj nor Yafi identified any other possible placements.

On February 2, 2017, DSS arranged for Benfaraj to visit with L.Y. The social worker did not notice anything inappropriate during that visit.

On February 7, 2017, the police arrested Benfaraj on two felony charges of child abuse or neglect and one felony charge of cruelty and injury to a child. On July 17, 2017, Benfaraj entered into a plea agreement, in which she pled guilty to one count of violating Code § 18.2-371.1(A), felony child abuse or neglect.[3] On September 22, 2017, the circuit court entered an order sentencing Benfaraj to six years in prison, with four years and six months suspended, on the charge of felony child abuse or neglect. Benfaraj's expected release date was May 9, 2018.

---

[2] DSS also learned that mother was possibly returning to Morocco with L.Y.

[3] The Commonwealth agreed to *nolle prosequi* the other charges against mother. On February 5, 2018, the circuit court entered a conviction order accepting Yafi's <u>Alford</u> plea to the charge of aggravated malicious wounding and guilty plea to the charge of child neglect.

DSS met with Benfaraj several times while she was incarcerated, provided her with updates and photographs of L.Y., and asked for contact information for possible relative placements. Benfaraj never asked about Y.Y. during her visits with DSS.

On February 28, 2017, the J&DR court entered an adjudicatory order finding that L.Y. was abused or neglected. On March 28, 2017, the J&DR court entered a dispositional order. On December 19, 2017, the J&DR court terminated Benfaraj and Yafi's parental rights to L.Y. and approved the goal of adoption. Benfaraj and Yafi appealed to the circuit court.

The parties appeared before the circuit court on March 13, 2018. DSS presented evidence that when L.Y. entered foster care, she was in good health, aside from having a blocked tear duct in her eye, which was later resolved. Additional evidence proved that L.Y. had been in the same foster home since January 27, 2017, and that she was "doing very well." L.Y. had bonded to her foster family and was attending daycare, where she could socialize with other children. The social worker testified that since entering foster care, L.Y. "has gone from walking to running . . . . She is speaking English. She can identify colors, body parts. She can name shapes. She can identify a friend in the classroom . . . . She is potty trained completely . . . . She sleeps through the night as well."

At the conclusion of DSS's evidence, Benfaraj made a motion to strike, which the circuit court denied. At the conclusion of all of the evidence, the circuit court terminated Benfaraj's parental rights to L.Y. pursuant to Code § 16.1-283(E)(iii) and (iv), and it approved the goal of adoption.[4] This appeal followed.

---

[4] The circuit court also terminated Yafi's parental rights to L.Y., and he appealed the ruling to this Court. See Yafi v. Stafford Dep't of Soc. Servs., Record No. 0529-18-4, this day decided.

ANALYSIS

In our review of a trial court's termination of parental rights, the "trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." Castillo v. Loudoun Cty. Dep't of Family Servs., 68 Va. App. 547, 558, 811 S.E.2d 835, 840-41 (2018) (quoting Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Fauquier Cty. Dep't of Soc. Servs. v. Ridgeway, 59 Va. App. 185, 190, 717 S.E.2d 811, 814 (2011) (quoting Martin v. Pittsylvania Cty. Dep't of Soc. Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986)).

*Termination of parental rights*

Benfaraj argues that the circuit court erred in finding that the evidence was sufficient to terminate her parental rights to L.Y. Benfaraj asserts that there was no evidence that she posed a danger to L.Y. or that L.Y. was hurt in her care.

The circuit court terminated Benfaraj's parental rights pursuant to Code § 16.1-283(E)(iv), which states that a court can terminate a parent's parental rights when it is in the best interests of the child and when the evidence proves that "the parent has subjected any child to aggravated circumstances." Code § 16.1-283(E) defines "aggravated circumstances" as

> torture, chronic or severe abuse, or chronic or severe sexual abuse, if the victim of such conduct was a child of the parent or a child with whom the parent resided at the time such conduct occurred, including the failure to protect such a child from such conduct, which conduct or failure to protect: (i) evinces a wanton or depraved indifference to human life, or (ii) has resulted in the death of such a child or in serious bodily injury to such a child.

Code § 16.1-283(E) also defines "serious bodily injury" as "bodily injury that involves substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ or mental faculty."

Here, the evidence proved that Benfaraj subjected Y.Y. to aggravated circumstances. Benfaraj admitted that she was the children's caretaker, and it was while Y.Y. was residing with Benfaraj and Yafi that he sustained his injuries. Dr. Foster testified that Y.Y. suffered abusive head trauma and non-accidental injury. She further opined that Y.Y.'s injuries "occurred on more than one occasion." As a result of his injuries, Y.Y. is permanently blind and has a permanent loss of brain tissue, which will affect his developmental milestones and cognitive function.

Furthermore, DSS's evidence proved that Benfaraj was aware of Y.Y.'s injuries several days before he obtained medical attention. Benfaraj produced a cell phone video, which showed that on January 23, 2017, Y.Y. had bruises on his head and forehead, and he could not open one of his eyes. Then, on January 24, 2017, Yafi reported to Benfaraj that he "struck" Y.Y., and Benfaraj saw a "lump in the middle of [Y.Y.'s] forehead" that was not there earlier. Benfaraj stated that she had never seen Yafi so agitated as he was at that time. At no time did Benfaraj seek medical attention for Y.Y. The circuit court found that Benfaraj "ignored entirely the emergent medical needs of a little boy in her home and under her care." It further concluded that "[i]t is clear that the condition that led to [Y.Y.'s] injuries cannot possibly be addressed such as to permit a safe return to an individual who could allow a small child to reside in their home and exhibit such horrendous injuries."

Pursuant to Code § 16.1-283(E)(iv), a court may terminate the parental rights of a parent who "has subjected *any* child to aggravated circumstances" as defined in Code § 16.1-283(E), if it is in the best interest of the child. (Emphasis added). As described above, the record shows that Benfaraj subjected Y.Y. to aggravated circumstances when she failed to address the abuse he

suffered at the hands of his father and demonstrated "a wanton or depraved indifference to [his] life." Further, the circuit court found that a termination of Benfaraj's parental rights was in L.Y.'s best interest when it concluded that "the condition that led to [Y.Y.'s] injuries cannot possibly be addressed such as to permit a safe return to an individual who could allow a small child to reside in their home and exhibit such horrendous injuries." Accordingly, the court did not err when it terminated Benfaraj's parental rights to L.Y. pursuant to Code § 16.1-283(E)(iv).

"When a trial court's judgment is made on alternative grounds, we need only consider whether any one of the alternatives is sufficient to sustain the judgment of the trial court, and if so, we need not address the other grounds." Kilby v. Culpeper Cty. Dep't of Soc. Servs., 55 Va. App. 106, 108 n.1, 684 S.E.2d 219, 220 n.1 (2009); see also Fields v. Dinwiddie Cty. Dep't of Soc. Servs., 46 Va. App. 1, 8, 614 S.E.2d 656, 659 (2005) (the Court affirmed termination of parental rights under one subsection of Code § 16.1-283 and did not need to address termination of parental rights pursuant to another subsection). Therefore, we will not consider whether the circuit court erred in terminating Benfaraj's parental rights pursuant to Code § 16.1-283(E)(iii).

*Motion for continuance*

Benfaraj argues that the circuit court erred by not granting her motion for a continuance when a subpoenaed witness notified the circuit court that she was not available to appear at the hearing. On February 9, 2018, Benfaraj requested that the court issue a witness subpoena for Dr. Catherine Nana Ama Abban to appear at the March 13, 2018 hearing. On February 27, 2018, Benfaraj filed a motion for a continuance because Dr. Abban was on a medical leave of absence and could not appear at the hearing. Benfaraj explained that Dr. Abban was expected to testify that in the fall of 2015, she treated L.Y. for bacteria in her right eye and prescribed medication for L.Y.'s eye. When DSS removed L.Y. from Benfaraj's care in January 2017, Benfaraj gave the social worker an unmarked eye cream for L.Y. Benfaraj asserts that Dr. Abban's testimony was necessary

if DSS was going "to use the fact that [mother] did not have a mark[ed] cream for [L.Y.'s] eye as proof that [mother] is a bad mother and should not have any further contact with the child." Benfaraj requested a continuance until Dr. Abban was available to testify. Benfaraj also argued that DSS should have been precluded from presenting any evidence about possessing unmarked eye cream for L.Y.

At the trial on March 13, 2018, Benfaraj raised the issue of her continuance request, but also acknowledged that the circuit court previously had denied her motion.[5] In addition, at the beginning of her presentation of evidence, Benfaraj called Dr. Abban as a witness, but again admitted that Dr. Abban was not able to be present and the court had denied her continuance request.

Assuming without deciding that the circuit court erred in denying the motion to continue, the error was harmless. An appellate court "will not reverse a trial court for evidentiary errors that were harmless to the ultimate result." Carter v. Commonwealth, 293 Va. 537, 544, 800 S.E.2d 498, 502 (2017) (quoting Shifflett v. Commonwealth, 289 Va. 10, 12, 766 S.E.2d 906, 908 (2015)). "In Virginia, non-constitutional error is harmless '[w]hen it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached.'" Andrews v. Creacey, 56 Va. App. 606, 625, 696 S.E.2d 218, 227 (2010) (quoting Code § 8.01-678). "If, when all is said and done, [it is clear] that the error did not influence the [fact finder], or had but slight effect, . . . the judgment should stand . . . ." Schwartz v. Schwartz, 46 Va. App. 145, 159, 616 S.E.2d 59, 66 (2005) (quoting Clay v. Commonwealth, 262 Va. 253, 260, 546 S.E.2d 728, 731-32 (2001)). An error may be found harmless when "overwhelming expert and other evidence support[s] the court's ultimate holding." Jenkins v. Winchester Dep't of Soc. Servs., 12 Va. App. 1178, 1185-86, 409 S.E.2d 16, 21 (1991).

---

[5] The record does not include an order or transcript of a pre-trial hearing denying mother's motion to continue.

- 11 -

Here, the evidence clearly supports the termination of Benfaraj's parental rights pursuant to Code § 16.1-283(E), as noted above. In issuing its ruling, the circuit court did not mention whether Benfaraj gave the social worker an unmarked eye cream for L.Y. Instead, the circuit court's focus was on the significant injuries to Y.Y., who was a child in Benfaraj's household, and for whom she did not seek treatment. Any error in denying the motion to continue was harmless and did not affect the circuit court's ruling.

CONCLUSION

For the foregoing reasons, the circuit court's ruling is affirmed.

<u>Affirmed.</u>